The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: March 30 2010**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 05-39734 |
| | ) | |
| The Wapakoneta Machine Co., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

## <u>MEMORANDUM OF DECISION AND ORDER RE APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM</u>

This case is before the court on the application for allowance and payment of claims for severance and accrued employee vacation pay as administrative expenses ("Application") filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local 105 (collectively, "the UAW"), [Doc. # 822], and Debtor's objection, [Doc. # 829]. The court held a hearing on the Application at which counsel for Debtor, for the UAW and for the Unsecured Creditors' Committee all attended in person.

The district court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings involving the allowance or disallowance of claims and to determine the priority of claims are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(B). For the reasons that follow, the court will grant the UAW's Application.

## BACKGROUND

The following facts are undisputed. On September 14, 2005, Debtor filed for relief under Chapter 11 of the Bankruptcy Code. It continued to operate its business as a debtor-in-possession pursuant to 11 U.S.C. § 1107 and 1108.

The UAW and Debtor had been parties to a succession of collective bargaining agreements regarding wages, benefits and other terms and conditions of employment of Debtor's former hourly production and maintenance employees at its facility in Wapakoneta, Ohio. On February 18, 2008, the UAW and Debtor entered into a new collective bargaining agreement ("CBA"), effective January 1, 2008. [Hrg. Ex. A]. The CBA remained in effect at all relevant times and included provisions addressing vacation and severance pay for Debtor's UAW employees.

Article IV of the CBA sets forth the terms of the parties' agreement regarding vacations. It provides in relevant part as follows:

**Section 1.** The vacation period shall be from January 1st to December 31st, inclusive. . . .

**Section 2-a.** Those employees who quit or are terminated after January 1st of the vacation year will be entitled to full benefits in accordance with the contract. . . . Each employee, upon termination, shall receive any vacation pay earned but not received since date of hire based on hours worked after January July (sic) 1st of each year.[1]

**Section 2-b.** All terminates, including retirees, will be paid vacation pay earned but not received up to date of retirement or other termination. Employees laid off will be paid vacation pay at time of layoff based on vacation pay earned but not received up to date of layoff. . . . When an employee retires and has earned vacation, which he has not used, he will be paid for that earned vacation time in lieu of time off. This includes any vacation yet due f[o]r the current year plus any vacation earned for the following year.

[Exhibit A, p. 6]. Sections 3 and 4 of Article IV set forth the amount of vacation an employee is entitled to based upon the employee's length of service to Debtor. [*Id.* at 6-7]. Under the CBA, vacations are earned during the year before the year during which the employee is eligible to take the vacation.

Article VII of the CBA includes the following provision for severance pay:

**Section 15.** If operations covered by this agreement shall be completely and permanently discontinued while this agreement is in force, the Company with respect to those employees with five (5) or more years of seniority whose employment is terminated as the result of such discontinuance of operation, will pay to each employee two weeks severance pay.

[*Id.* at 20]. The manner in which seniority rights are to be determined under the CBA is set forth in Article

---

[1] There is no dispute that the contract should read "based on hours worked after January 1st of each year" and that the word "July" was erroneously included in that sentence.

2

V as follows:

> **Section 1-a.** Seniority rights of employees shall be determined from the first day of hiring. . . for all employees who were on the payroll of the Company and working within the meaning of this agreement, on March 3, 1943, whose services have not been interrupted through any fault of their own. New employees shall be on probation for a period of sixty (60) days from the date of hiring and shall be placed upon the plant seniority list on the completion of their probationary period.

[*Id.* at 10].

A Second Amended Plan of Reorganization filed by Debtor was confirmed by the court on November 24, 2008. However, Debtor was unable to consummate the plan and in September 2009, sought authority to sell substantially all of its operating assets under § 363 of the Bankruptcy Code in order to maximize the benefit to and recoveries for all of Debtor's creditors. [*See* Doc. # 749]. On October 23, 2009, the court vacated its earlier order confirming Debtor's Second Amended Plan and entered an order authorizing the sale of assets. [Doc. ## 803, 804].

After it filed its bankruptcy petition and throughout the sale process, Debtor continued to employ UAW-represented employees. It is undisputed that the postpetition services performed by these employees, including production of goods and a build-up of inventory and work-in-progress, which, among other things, were the subject matter of the proposed asset sale, benefitted Debtor's estate. On November 18, 2009, representatives of Debtor notified the UAW that November 19, 2009, would be the last day of work for its members. Debtor has since totally and permanently ceased operations at its Wapakoneta plant. It has not paid its UAW employees severance pay or vacation pay for vacations earned in 2009 but which they were not eligible to take until 2010.

## LAW AND ANALYSIS

In its Application, the UAW requests the allowance and payment of vacation pay in the total amount of $52,435.00 as administrative expenses for fourteen UAW-represented employees, which amount would have been paid under the terms of the CBA during the 2010 work year had the plant not closed. [*See* Application, Ex. C]. In addition, the UAW requests the allowance and payment of severance pay in the total amount of $20,210.20 as administrative expenses for thirteen of those employees, all of whom have at least five years of seniority.[2] [*Id.*].

Under the Bankruptcy Code, administrative expenses include "the actual, necessary costs and

---

[2] Although the Application includes a request for severance pay for fourteen hourly employees, at the hearing, the UAW withdrew its request as to David Deitler, who it concedes has less than five years of seniority and is not entitled to severance pay.

3

expenses of preserving the estate including. . . wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A)(i). In order for a claim to be allowed as an administrative expense, "a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.),* 831 F.2d 106, 110 (6th Cir. 1987) (citing *In re Mammoth Mart, Inc.* 536 F.2d 950, 954 (1st Cir.1976)); *Caradon Doors and Windows, Inc. v. Eagle-Picher Industries, Inc.*, 447 F.3d 461, 464 (6th Cir. 2006)

## I. Vacation Pay

While Debtor does not dispute the fact that the employees in this case were employed through November 19, 2009, and that their postpetition employment benefitted the bankruptcy estate, it argues that the terms of the CBA do not require payment of vacation pay unless their employment was terminated after January 1, 2010. The UAW, on the other hand, contends that the language of the CBA clearly requires payment of all vacation pay earned but not received up to the date of termination. It further contends that under Sixth Circuit caselaw, earned vacation benefits are a form of deferred compensation to which employees are entitled upon their permanent separation from employment due to a plant closing. For the reasons that follow, the court agrees that Debtor's UAW employees are entitled to their vacation pay earned during 2009.

The Supreme Court has recognized that the status of vacation benefits provided under a collective bargaining agreement is dependent on the provisions of the contract. *See Foster v. Dravco Corp.*, 420 U.S. 92, 99-100 (1975). In *Foster*, the court stated that "the presence of a work requirement is strong evidence that the benefit in question was intended as a form of compensation." *Id.* at 99. Thus, where vacation pay is based on employee services already performed, the Sixth Circuit has repeatedly held that it constitutes additional wages for such services. *See, e.g., Local 58, United Rubber, Cork, Linoleum & Plastic Workers v. Sun. Prod. Corp.*, 521 F.2d 1286 (6th Cir. 1975); *Int'l Assoc. of Machinists and Aerospace Workers, Local Lodge 2369 v. Oxco Brush Div. of Vistron Corp.* ("*Oxco*"), 517 F.2d 239, 243 (6th Cir. 1976); *Schneider v. Electric Auto-Lite Co.*, 456 F.2d 366, 371 (6th Cir. 1972).

In *Schneider*, former employees sought vacation pay based on their earnings in 1962 after the permanent shutdown of their employer's plant in August 1962. The court rejected the employer's argument that a qualifying date of December 31 contained in a provision of the collective bargaining agreement for entitlement to vacation and vacation pay was a sine qua non to the right to receive such pay and found the

05-39734-maw   Doc 869   FILED 03/30/10   ENTERED 03/30/10 12:59:43   Page 4 of 9

employees eligible for the requested vacation pay as it was consideration for past services rendered. *Schneider*, 456 F.2d at 371-72; *see Oxco*, 517 F.2d at 245 (holding that a provision requiring a person to be an employee of the company on December 31 to be granted vacation pay in the following year ("the vacation year") was not a material part of the contract as that date was not critical to the vacation pay calculation and that the employees were entitled to pro rata vacation pay as additional compensation for services performed during the "measuring year."); *Sun Products Corp.*, 521 F.2d at 1288 ("The material requirement of the agreement for vacation with pay are those which pertain to the 'measuring year' . . . not those which relate to the 'vacation year'. . . ."). Moreover, the court found that even if the "qualifying date" in the collective bargaining agreement was an "inexorable condition of eligibility" for vacation pay, the company's unilateral action in closing the plant rendered it impossible for the employees to continue working to the qualifying date and, therefore, removed the obligation of working until that date. *Id.* at 372 (citing *Local Union No. 186, United Packinghouse Food & Allied Workers v. Armour & Co.*, 446 F.2d 610, 614-15 (6th Cir. 1971), *cert. denied,* 405 U.S. 955 (1972)(stating that "it appears that the company's unilateral action in closing down the plant, which is effectively a refusal to accept the proffer of continued performance on the part of the employees, removes the obligation of working until the [qualifying] date, even if it is viewed as a material part of the contract.")).

Under the CBA in this case, there is no question that vacation pay is based upon a work requirement such that it constitutes deferred compensation for services performed. [*See* Ex. A, Art. IV, §§ 3 & 4]. The CBA itself repeatedly refers to vacation pay "earned." [*Id*. at § 2-a, 2-b, 8-a]. There is some ambiguity, however, as to whether January 1 is a qualifying date under the CBA for being paid vacation pay and, specifically, whether an employee whose employment is terminated before January 1 may receive vacation pay earned during the year they were terminated. For example, Section 1 of Article IV provides that "[t]hose employees who quit or are terminated *after* January 1st of the *vacation* year will be entitled to full benefits in accordance with the contract" while section 2-b provides that "[a]ll terminates, including retirees, will be paid vacation pay earned but not received *up to date of retirement or other termination.*" [Ex. A, Art. IV, § 1 & 2-b (emphasis added)]. Notwithstanding this ambiguity, and even if the CBA includes a qualifying date of January 1, the court finds the reasoning in the above cited Sixth Circuit cases equally applicable in this case. The date of January 1 is not critical to the vacation pay calculation and, as in *Oxco*, appears to have been selected solely for administrative convenience. *See Oxco*, 517 F.2d 245. A requirement to be employed by Debtor on January 1 of the "vacation year" in order to receive vacation pay earned during the "measuring year" is similar to the requirements in *Oxco*, *Schneider*, and *Sun Products*

5

*Corp.*, which the Sixth Circuit found were not material. Moreover, Debtor's unilateral decision to cease operations at the Wapakoneta plant in November 2009 removed any obligation of its employees to work until January 1, 2010, in order to receive the vacation benefits they earned during 2009. *See Schneider*, 456 F.2d at 372.

There being no dispute regarding the amount of the vacation pay earned in 2009 by each of the employees as set forth in exhibit C attached to the Application, the court finds that the employees are entitled to vacation pay as set forth therein. Because the vacation pay debt arose from a transaction with Debtor acting in its capacity as debtor-in-possession, namely the CBA, and there being no dispute that the employees' postpetition employment benefitted the bankruptcy estate, the court will grant the UAW's Application for allowance of the accrued vacation pay as an administrative expense.

## II. Severance Pay

The UAW also seeks administrative expense priority for severance pay for Debtor's employees that had five or more years of seniority at the time Debtor ceased operations at the plant and their employment was terminated. It also argues that its severance pay claim is entitled to priority under 11 U.S.C. § 1113(f). Debtor does not dispute that the employees are entitled to severance pay under the provisions of the CBA. It argues, however, that the employees are not entitled to have all of their severance benefits paid as an administrative expense. According to Debtor, since its bankruptcy petition was filed in September 2005 and the employment of the UAW employees was terminated in November 2009, the employees worked for it as debtor-in-possession for only approximately four years. Citing caselaw setting forth the well-accepted "benefit to the estate" test, Debtor argues that severance pay should be prorated and paid as an administrative expense in an amount equal to 80% (or four-fifths) of the total severance pay claim and as a general unsecured claim in an amount equal to 20% (or one-fifth) of the claim.

Initially, the court rejects the UAW's argument that the severance pay claim is entitled to priority under § 1113(f). This argument is presumably based upon the Sixth Circuit decision in *United Steelworkers of America v. Unimet Corp. (In re Unimet Corp.)*, 842 F.2d 879 (6th Cir.1988), *cert. denied*, 488 U.S. 828 (1988), and its progeny. In *Unimet*, the court found that retiree benefits under a prepetition collective bargaining agreement were not payable as an administrative expense under § 503 but that "qualification as an administrative expense is not necessary for the union to prevail." *Unimet*, 842 F.2d at 884. The court explained that § 1113(f) "unequivocally prohibits the employer from unilaterally modifying any provision of the collective bargaining agreement" and held that the debtor could not "escape its obligations in this regard merely because the requirements of section 503 arguably have not been satisfied." *Unimet*, 842 F.2d

6

at 884. Courts have interpreted *Unimet* as holding that § 1113(f) grants super-priority status to claims for benefits under an unrejected collective bargaining agreement. *See, e.g.*, *Int'l Union v. Acorn Bldg. Components, Inc. (In re Acorn Bldg. Components, Inc.)*, 170 B.R. 317, 320 (E.D. Mich. 1994) (quoting *Unimet* and stating that "§ 1113(f) requires a debtor-in-possession to comply 'with *all* provisions of the collective bargaining agreement *unless and until rejection was permitted by the court*.'" (emphasis in original)); *United Steel Workers v. Ohio Corrugating Co.*, No. 4:90CV0810, 1991 WL 213850, *4, 1991 U.S. Dist. LEXIS 21737, *9 (N.D. Ohio Jan. 3, 1991) (stating that "Unimet does not explicitly state that claims under section 1113 should be given "super-priority" over claims under section 507. Yet, by requiring that the retiree benefits of the unrejected collective bargaining agreement be paid, despite failing to qualify as an administrative expense, Unimet, in effect, established a super-priority over section 507."). This case is distinguishable in that the UAW claims arise under a postpetition collective bargaining agreement that is not subject to rejection and the provisions relating thereto in § 1113. *See In re Leslie Fay Companies, Inc.*, 168 B.R. 294, 300-01 (Bankr. S.D.N.Y. 1994) (explaining that contracts entered into postpetition are not subject to rejection under § 365 and reasoning that because § 1113 establishes special treatment for one type of executory contract, it should apply only to prepetition collective bargaining agreements absent specific language to the contrary); *cf. Tully Constr. Co. v. Cannonsburg Envtl. Assoc. (In re Cannonsburg Envtl. Assoc)*, 72 F.3d 1260, 1265-66 (6th Cir. 1996) (citing *In re Leslie Fay Companies, Inc.,* with approval and holding that § 365 does not apply to postpetition loans).

Nevertheless, while the court agrees that it must apply the "benefit to the estate" test in determining administrative expense priority status under § 503, for the following reasons, the court finds that the entire UAW severance pay claim meets that test. The Sixth Circuit has explained that in applying the "benefit to the estate" test, a court must look "to when the acts giving rise to a liability took place. . . ." *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 818 (6th Cir. 1997). Thus, the first prong of the test requires that the debt arose from a transaction with the debtor-in-possession as opposed to the preceding entity. That prong is satisfied in this case since the agreement to pay severance benefits is contained in the CBA entered into postpetition between Debtor, in its capacity as debtor-in-possession, and the UAW.

The second prong of the test requires that the debt directly and substantially benefitted the estate. *Id.* at 816. The benefit to the estate test, therefore, "limits administrative claims to those where the consideration for the claim was received during the post-petition period." *Id.* This is the basis of Debtor's argument that the priority status of the UAW severance pay claim should be prorated to reflect only the

05-39734-maw    Doc 869    FILED 03/30/10    ENTERED 03/30/10 12:59:43    Page 7 of 9

employees' postpetition service to Debtor as debtor-in-possession. For the following reasons, however, the court disagrees.

It is true that the majority of courts have denied administrative expense priority for former employees' severance pay claims based on length of service to the extent that consideration for the severance pay was provided on a prepetition basis. *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st Cir. 1976) (denying administrative expense priority for former employees' severance pay claims where the claims were based entirely on services performed by the employees before the filing of bankruptcy); *accord Lines v. Sys. Bd. of Adjustment No. 94 Bhd. of Ry., Airline & Steamship Clerks (In re Health Maint. Found.)*, 680 F.2d 619 (9th Cir. 1982); *see In re Roth American, Inc.*, 975 F.2d 949, 958 (3rd Cir. 1992) (holding that severance pay claims based on employees' length of service were entitled to priority as administrative claims only to extent earned by service during the bankruptcy case); *In re Yarn Liquidation, Inc.*, 217 B.R. 544 (Bankr. E.D. Tenn. 1997) (same); *In re Russell Cave Co.,* 248 B.R. 301 (Bankr. E.D. Ky. 2000). *But see, Straus-Duparquet, Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 386 F.2d 649 (2d Cir. 1967) (finding severance pay claims entitled to administrative priority because "severance pay is compensation for termination of employment and since the employment of [the] claimants was terminated as an incident of the administration of the bankrupt's estate").

This case is distinguishable from the cases cited above in that, in each of those cases, the employees' right to receive severance pay in the event of termination of their employment was set forth in a contract entered into prepetition. The liability for severance pay based upon an employee's service arose when the debtor received the contemplated consideration for such right, namely, the service requirement set forth in the agreement. Thus, it was incumbent upon those courts to consider when the consideration was given. To the extent the consideration consisted of service rendered prepetition, it did not benefit the bankruptcy estate and the severance pay claim was not afforded priority status as an administrative expense.

By contrast, in this case, the right to receive severance pay was set forth in the CBA entered into postpetition. Debtor, as debtor-in-possession, agreed that employees who had five years of seniority, regardless of when their seniority was obtained, would receive severance pay in the event their employment was terminated. Under the CBA, seniority rights are determined based upon the employee's date of hiring. The fact that an employee already had five years of seniority or had served some portion of that five years before Debtor's bankruptcy petition was filed has no bearing on the consideration given by the employee in exchange for Debtor's agreement regarding severance pay. Unlike a prepetition contract provision regarding severance pay that could not have served to induce employees to continue working for the debtor

8

as debtor-in-possession, under the circumstance of this case, the consideration for Debtor's agreement to pay severance pay was the employees' willingness to continue working for Debtor on a postpetition basis, thus, allowing Debtor to maximize recovery in the sale of its assets. *Cf. Sunarhauserman, Inc.,* 126 F.3d at 819 ("The purpose of § 503 is to grant priority only to the claims of those entities who are induced to do business with the debtor *post-petition*."). There is no dispute that this consideration was a benefit to the Debtor's bankruptcy estate.

Because the court finds that the acts giving rise to the severance pay liability, namely, entering into the CBA and the employees' continued employment, took place postpetition, it will grant the UAW's Application for allowance of the severance pay claim as an administrative expense. *See Sunarhauserman, Inc.,* 126 F.3d at 818. In addition, Debtor has indicated that it is administratively solvent, and Debtor's attorneys and attorneys for the Unsecured Creditors' Committee have both applied for, and the court has authorized, the payment of the administrative expense for attorney fees. The court will likewise grant the UAW's Application not only for allowance but also for payment of the employee severance and vacation pay as an administrative expense.

**THEREFORE**, for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the Application [Doc. # 822] be, and hereby is, **GRANTED.** The UAW claim for vacation pay in the amount of $52,435.00 and severance pay in the amount of $20,210.20 as set forth in Exhibit C attached to the Application and as modified by the UAW at the hearing is allowed and shall be paid as an administrative expense.

9